1

2

3

4

5

6

7

8                           **UNITED STATES DISTRICT COURT**

9                          **CENTRAL DISTRICT OF CALIFORNIA**

10

11   LORI MAE VASSAR,                          Case No. EDCV 14-1566 SS

12                 Plaintiff,

13        v.

14   CAROLYN W. COLVIN,                         **MEMORANDUM DECISION AND ORDER**
     Acting Commissioner of the
15   Social Security Administration,

16                 Defendant.

17

18

19                                      **I.**

20                                 **INTRODUCTION**

21

22        Plaintiff Lori Mae Vassar ("Plaintiff") seeks review of the

23   final  decision  of  the  Commissioner  of  the  Social  Security

24   Administration  (the  "Commissioner"  or  the  "Agency")  denying

25   Plaintiff's  application  for  disability  benefits.    The  parties

26   consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of

27   the undersigned United States Magistrate Judge.  For the reasons

28   stated below, the decision of the Commissioner is AFFIRMED.

## II.

### PROCEDURAL HISTORY

Plaintiff filed an application for Title II and XVIII Disability Insurance Benefits ("DIB") on November 8, 2010, and for Title XVI Supplemental Security Income ("SSI") on November 9, 2010. (Administrative Record ("AR") 24-25, 71-81). She alleged a disability onset date of November 3, 2010, in her DIB application and of November 2, 2010, in her SSI application.[1] (AR 71, 74). The Agency denied Plaintiff's applications on May 9, 2011, and upon reconsideration on December 22, 2011. (AR 26-29, 31). On February 9, 2012, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 34-35). Plaintiff testified at a hearing before ALJ Mark Greenberg on November 19, 2012 (the "ALJ Hearing"). (AR 471-93). On December 7, 2012, the ALJ issued a decision denying benefits. (AR 10-22). Plaintiff filed a request for review of the ALJ's unfavorable decision on December 17, 2012, which the Appeals Council denied on May 29, 2014. (AR 3-6). The ALJ's decision thus became the final decision of the Commissioner. (AR 3). Plaintiff filed the instant action on August 4, 2014. (Dkt. No. 4).

\\

\\

\\

\\

---

[1] Plaintiff underwent heart bypass surgery on November 3, 2010, one day after suffering an acute myocardial infarction. (AR 151-153).

**III.**

**FACTUAL BACKGROUND**

Plaintiff was born on April 22, 1969. (AR 24, 474). She was forty-one years old as of the alleged disability onset date and forty-three years old at the time of the ALJ Hearing. (AR 71, 473). She has a high school diploma and has worked as a warehouse worker and stocking clerk. (AR 107-12, 474). She was a Wal-Mart employee on her alleged disability onset date. She returned to work several months after her onset date before resigning. (AR 71, 289, 476). She receives food stamps and General Relief benefits. (AR 480-81). In her applications, Plaintiff alleged that she suffers from a heart condition, angina, substance abuse, a staph infection, bipolar disorder, depression, sleep problems and high cholesterol. (AR 101, 142).

Plaintiff lives in a house with roommates. (AR 478). She is a former smoker, although she claims that she quit two months before the ALJ Hearing. (AR 272, 279, 485). She has a recurring history of opiate addiction, although she asserts that she was not using opiates at the time of the ALJ Hearing. (AR 308, 321, 439, 477). She underwent cardiac, pectoral and leg surgery and has a history of vascular problems and heart disease. (AR 152, 195, 197, 199, 332-33, 474).

\\
\\
\\
\\

A.   **Physical Health Assessments**

On November 3, 2010, Plaintiff suffered a heart attack and underwent emergency quadruple bypass surgery at Mercy Medical Center.  (AR 152, 474).  She was diagnosed with acute myocardial infarction, coronary artery disease, unstable angina, hypertension, hyperlipidemia, tobacco abuse disorder and anemia and was discharged several days after her surgery.  (AR 152).  On November 16, 2010, Plaintiff returned to the hospital complaining of a chest wound infection related to her heart surgery.  (AR 195).  She was examined by Richard M. Briggs, M.D., her heart surgeon, who opined that Plaintiff showed signs of poor healing on her sternal wound.  (AR 256, 360).  Two weeks later, Dr. Briggs and S. Matthew Becker, M.D., a plastic surgeon, performed a sternal wound debridement and muscle flap surgery.  (AR 256-57).  In a follow-up visit on December 27, 2010, Dr. Briggs opined that Plaintiff was doing "very well" and advised her to maintain a heart-healthy diet.  (AR 257).  He also assigned strict weight-bearing limits.  (Id.).

On December 28, 2010, Plaintiff reported to her cardiologist, Barry I. Michelsen, M.D., for a follow-up visit. (AR 360).  A physical examination revealed a "well-nourished woman in no acute distress."  (Id.).

On April 11, 2011, Thomas Conway, M.D., Plaintiff's primary care provider, examined Plaintiff after she complained of three days of continuous chest pain.  (AR 278).  Plaintiff claimed to

1    "lift a lot at work." (Id.).    A physical examination revealed

2    regular heart rate and rhythm and intact motor movements of the

3    upper and lower extremities.    (AR 279-80).    A review of

4    Plaintiff's systems revealed "all pertinent negatives and no

5    pertinent positives" beyond Plaintiff's known medical history.

6    (AR 279).   Plaintiff was discharged the same day and instructed

7    to maintain light activity and a cardiac diet.   (AR 281).

8

9        On May 16, 2011, Plaintiff underwent a shoulder evaluation

10   at Premier Therapy Associates.   (AR 330).   Plaintiff complained

11   that her "current pain rate" on a ten-point scale was "4-5" but

12   could reach "7-8." (Id.).   Three days later, Dr. Becker wrote an

13   interim report releasing Plaintiff to return to work without any

14   lifting restrictions.   (AR 329).

15

16       On July 5, 2011, Plaintiff returned to Dr. Michelsen for a

17   follow-up visit.   (AR 348).   Plaintiff complained of muscle aches

18   and pain and swelling in her legs, as well as nervousness, mood

19   swings, depression and chronic fatigue.   (Id.).   However, Dr.

20   Michelsen again found Plaintiff in no distress and his

21   examination revealed no signs of cyanosis, clubbing or edema in

22   her extremities.   (Id.).   Nevertheless, Dr. Michelsen signed a

23   "Work Release" report after Plaintiff requested an excuse from

24   work due to swelling in her legs.   (AR 350, 355).   In the report,

25   Dr. Michelsen restricted Plaintiff to carrying no more than

26   twenty pounds and walking no more than fifty feet.   (AR 350).

27   \\

28

1     On August 17, 2011, Plaintiff returned to Mercy Medical
2  Center and had a stent placed in her right leg after she
3  complained of pain and swelling. (AR 332-33). In January 2012,
4  Plaintiff experienced chest pains and admitted herself to the
5  Parkview Community Hospital. (AR 419). A physician ruled out
6  coronary disease as the cause and opined that Plaintiff's
7  symptoms were gastrointestinal. (AR 421). Testing revealed full
8  range of motion in Plaintiff's extremities and intact sensory
9  functioning of her muscle groups. (AR 424). Plaintiff was
10  discharged the following day. (AR 418).

11

12     On April 30, 2012, Plaintiff had a medical checkup at
13  Whiteside Manor. (AR 470). The physician recorded that
14  Plaintiff was "working hard on the treadmill [that] morning" and
15  she "[felt] pretty good about it." (Id.). He also noted that
16  Plaintiff was taking Prozac, Trazodone and Vistaril.[2] (Id.). On
17  October 25, 2012, George Nagib, M.D., a family health physician
18  at the Riverside County Department of Health, examined Plaintiff.
19  (AR 446). Dr. Nagib noted that Plaintiff was "non-compliant with
20  her diet" and was at a "higher risk of diabetes." (AR 446, 449).
21  He also noted that Plaintiff had congestive heart failure and
22  prescribed Lasix. (AR 450).

23

24  ───────────────
    [2]  According to the National Institutes of Health, Prozac
25  (fluoxetine) may be prescribed for depression, obsessive-
    compulsive disorder, some eating disorders and panic attacks.
26  Trazodone is used to treat depression and Vistaril (hydroxyzine)
    is prescribed for allergies and nausea such as motion sickness.
27  See         MEDLINEPLUS,          http://www.nlm.nih.gov/medlineplus/
    druginformation.html, and search by drug name (last visited July
28  10, 2015).

**B.**   <u>**Mental Health Assessments**</u>

On April 17, 2008, Plaintiff underwent a psychological consultation at The Primary Care Center. (AR 321). Plaintiff admitted to a history of opiate abuse and was addicted to Oxycontin at the time. (<u>Id.</u>). On October 28, 2010, however, Plaintiff was reportedly eighteen months sober. (AR 306).

On May 2, 2011, state agency examining physician Philip K. Axtell, Ph.D., performed a psychological evaluation of Plaintiff. (AR 287). Plaintiff reported severe depression over the previous month and stated that she was taking Ambien for sleeplessness and Citalopram for depression. (AR 288). She claimed that she was formerly in rehabilitation for pain pill abuse following surgery in February 2009. (<u>Id.</u>). Plaintiff reported suicidal ideations and unhappiness with her life situation. (<u>Id.</u>). However, she estimated that she had an average of three "good days" per week during which she got up early, cleaned her house and went shopping. (<u>Id.</u>). Plaintiff was also able to prepare meals, wash dishes, drive regularly, clean her bathroom and do laundry, although she ceased yard work after her surgery. (AR 289-290). Dr. Axtell found that Plaintiff showed evidence of mildly impaired short-term memory, but found no evidence of problems with concentration, a concern of Plaintiff. (AR 289). He found no evidence of long-term memory impairment. (<u>Id.</u>).

Plaintiff fell into the average range of intellectual functioning. (<u>Id.</u>). She successfully completed five of six

1  serial-three tests and recalled three out of three previously
2  named objects after a three-minute delay. (Id.). Her demeanor
3  was "cooperative, pleasant and candid." (Id.). In a mental and
4  social evaluation checklist, Dr. Axtell assessed no more than
5  "mild" limitations in any category. (AR 291-92). He assessed
6  Plaintiff's mental state as "euthymic," although he noted that
7  Plaintiff teared up once. (AR 290). He diagnosed major
8  depressive disorder and general anxiety disorder based on former
9  medical records from Plaintiff's primary care provider. (AR 287,
10  290).

11

12      On May 9, 2011, Plaintiff returned to The Primary Care
13  Center and complained that she was unable to work because of
14  chest pains. (AR 308). Progress notes indicate that Plaintiff
15  had relapsed on narcotics and was not receiving treatment for
16  depression. (Id.). Plaintiff was diagnosed with chest pain,
17  narcotic dependency, and depression. (AR 308). Plaintiff was
18  subsequently prescribed forty milligrams of Celexa. (AR 308,
19  385).

20

21      On October 4, 2011, Plaintiff underwent a second
22  psychological evaluation after she submitted an additional
23  function report emphasizing her depression and anxiety. (AR 369-
24  70). Plaintiff told examining psychologist Alice K. Garland,
25  M.S., that she had been depressed since 1999 but saw a
26  psychiatrist only once for a brief interview. (AR 370).
27  Plaintiff said she felt suicidal but had never attempted suicide.
28  (AR 371). She expressed a lack of desire to "go anywhere" and

8

admitted that she showered only once every four to five days. (Id.).   Plaintiff said that during a three-month period of work at Wal-Mart, she was absent eleven days. (Id.).   Plaintiff noted that she let dishes accumulate for about a week before washing them and only mopped and dusted once per month. (Id.).   However, she enjoyed reading, drove occasionally and went shopping with her mother once per month. (AR 369, 371).   She ate out approximately once per month and spoke with a friend on the phone about once a week. (AR 371).

Dr. Garland noted that Plaintiff was neatly dressed, well-groomed and had appropriate hygiene, although she displayed emotionally labile behavior. (AR 369).   Dr. Garland also opined that Plaintiff exhibited nervousness, mood swings and chronic fatigue, but was not in acute distress. (AR 372).   She diagnosed Plaintiff with major depressive disorder. (Id.).

In July 2012, Plaintiff underwent a psychiatric assessment at the Riverside County Department of Mental Health. (AR 438).   Plaintiff complained of anger, depression, fatigue and concentration issues. (Id.).   Plaintiff appeared depressed and unable to concentrate, but a mental examination revealed that Plaintiff was alert with intact short-term memory and good insight and judgment. (AR 438-39).

\\

\\

\\

\\

**C.    Plaintiff's Evidence**

     **1.    Plaintiff's Testimony Before The ALJ**

At the ALJ Hearing, Plaintiff testified that although she tried to go back to work at Wal-Mart after her heart attack, she had to resign due to her health. (AR 475-76). She said that she had not exercised since before her heart attack. (AR 490). When Plaintiff tried to walk on a treadmill, she "[could not] do it." (Id.). She also "might've tried to ride a bike." (AR 491). She claimed that she was compliant with her dietary prescription, although she weighed nearly thirty pounds more at the ALJ Hearing than she did before her heart attack. (AR 479-80). Plaintiff admitted that she was in recovery for opiate addiction but claimed that she had been sober for over a year. (AR 477). Plaintiff stopped smoking approximately two months before the ALJ Hearing. (AR 485).

Plaintiff testified that on a typical day, she performed a variety of household tasks but could not be on her feet for long periods of time. (AR 477). She could not go outside or go shopping because of the pain in her legs. (Id.). She did not cook meals often and she could not do laundry because of her inability to lift more than a "couple of pounds." (AR 478). She noted that she went on Facebook to communicate with family members but was otherwise not computer literate. (AR 482).

Plaintiff also testified that she was diagnosed with severe depression in 2002 but did not begin psychiatric treatment for this condition until November 2011. (AR 487-88). Her emotional problems had significantly worsened since the onset of her cardiovascular issues. (AR 488). She "[felt] like [she was] in a hole" and "[could not] get out." (Id.). She estimated that she could not get out of bed approximately twenty days per month. (AR 488-89).

### 2. Plaintiff's Function Reports

Plaintiff filed two "function reports" with her applications for disability benefits. (AR 115-122, 132-139). In the first report, dated January 4, 2011, Plaintiff wrote that on a typical day she ate breakfast, took medication, rested, read books and walked around the house for exercise "as much as possible." (AR 116). However, she did not clean or do yard work because she could not "stand or walk or lift." (AR 117). She was also "unable to drive" and did not go out in public because she was "afraid of germs." (AR 118). Plaintiff reported that her disabilities affected her memory, understanding and concentration, but stated that she had a normal attention span. (AR 120).

Plaintiff completed a second function report on July 29, 2011, approximately eleven weeks after her initial disability applications were denied. (AR 132-139). She noted that she could not lift or walk more than thirty feet without pain. (AR

132).   Her  depression  had  worsened  and  she  "[did]  not  want  to

socialize  with  any  of  [her]  co-workers."   (AR  132).   Her

depression  kept  her  in  bed  and  she  sometimes  went  two  days

without  sleep.   (AR  133).   She  could  not  pay  her  bills  because

she  had  not  had  any  income  since  November  2010.   (AR  135-36).

Her  chest  pain  prevented  her  from  driving  and  she  could  not  lift

more  than  five  pounds.   (AR  135,  137).   She  did  "literally

nothing"  and  went  "nowhere."   (AR  133,  136).   However,  she  went

to  the  grocery  store  to  shop  for  food  twice  per  month,  sometimes

accompanied  by  a  family  member.   (AR  135).

Plaintiff  read  for  about  an  hour  per  day  and  also  watched

television  and  used  her  computer.   (AR  136).   She  also  noted  that

she  cared  for  her  dog,  did  laundry  and  prepared  sandwiches  for

herself.   (AR  133,  134).   She  stated  that  her  alleged

disabilities  limited  her  ability  to  follow  instructions,  but  also

stated  that  she  could  follow  both  written  and  spoken  instructions

"fairly  well."   (AR  137).

**IV.**

**THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

To  qualify  for  disability  benefits,  a  claimant  must

demonstrate  a  medically  determinable  physical  or  mental

impairment  that  prevents  her  from  engaging  in  substantial  gainful

activity  and  that  is  expected  to  result  in  death  or  to  last  for  a

continuous  period  of  at  least  twelve  months.   Reddick v. Chater,

157  F.3d  715,  721  (9th  Cir.  1998)  (citing  42  U.S.C.  §  423

(d)(1)(A)).  The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423 (d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920. The steps are:

(1)  Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

(2)  Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)  Does the claimant's impairment meet or equal one of the specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)  Is the claimant capable of performing her past work?  If so, the claimant is found not disabled. If not, proceed to step five.

(5)  Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

1   <u>Tackett</u>, 180 F.3d at 1098-99; <u>see also</u> <u>Bustamante v. Massanari</u>,

2   262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted); 20

3   C.F.R. §§ 404.1520(b)-(g)(1) & 416.920(b)-(g)(1).

4

5        The claimant has the burden of proof at steps one through

6   four, and the Commissioner has the burden of proof at step five.

7   <u>Bustamante</u>, 262 F.3d at 953-54.   Additionally, the ALJ has an

8   affirmative duty to assist the claimant in developing the record

9   at every step of the inquiry.   <u>Id.</u> at 954.   If, at step four, the

10  claimant meets her burden of establishing an inability to perform

11  past work, the Commissioner must show that the claimant can

12  perform some other work that exists in "significant numbers" in

13  the national economy, taking into account the claimant's residual

14  functional capacity ("RFC"), age, education and work experience.

15  <u>Tackett</u>, 180 F.3d at 1098, 1100; <u>Reddick</u>, 157 F.3d at 721; 20

16  C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).   The Commissioner may do

17  so by the testimony of a vocational expert ("VE") or by reference

18  to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part

19  404, Subpart P, Appendix 2 (commonly known as "the Grids").

20  <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1162 (9th Cir. 2001).   When a

21  claimant has both exertional and non-exertional limitations, the

22  Grids are inapplicable and the ALJ must take VE testimony.   <u>Moore</u>

23  <u>v. Apfel</u>, 216 F.3d 864, 869 (9th Cir. 2000) (citing <u>Burkhart v.</u>

24  <u>Bowen</u>, 856 F.2d 1335, 1340 (9th Cir. 1988)).

25

26

27

28

14

1
**V.**

2
**THE ALJ'S DECISION**

3

4      The ALJ employed the five-step sequential evaluation process

5 and concluded that Plaintiff was not disabled within the meaning

6 of the Social Security Act from her alleged disability onset date

7 of November 2, 2010 through the last date insured.  (AR 11-12).

8 At step one, the ALJ found that Plaintiff had not engaged in

9 substantial gainful employment since November 2, 2010.  (AR 12).

10 At step two, the ALJ found that Plaintiff had the following

11 severe impairments: peripheral vascular disease, coronary artery

12 disease, status post myocardial infarction, obesity, pre-diabetes

13 mellitus, congestive heart failure, gastroesophageal reflux

14 disease, hypertension, noncompliance with treatment, status post

15 bilateral rotator cuff surgery in 2006 and 2007 by history,

16 depression, anxiety disorder and a history of opiate dependence.

17 (AR 13).

18

19      However, at step three, the ALJ found that Plaintiff did not

20 have an impairment or combination of impairments that met or

21 medically equaled one of the listed impairments in 20 C.F.R. Part

22 404, Subpart Part P, Appendix 1.[3]  20 C.F.R. §§ 404.1520(d),

23 404.1525, 404.1526, 416.920(d), 416.925 and 416.926.  (AR 13).

24 The ALJ specifically found that no treating or examining

25 physician recorded any findings equivalent in severity to the

26

27 [3] A physical or mental impairment is considered "severe" if it
significantly limits [the claimant's] physical or mental ability

28 to do basic work activities."  20 C.F.R. § 404.1520.

15

criteria of any listed physical impairment. (Id.). The ALJ also found that Plaintiff's mental impairments neither met nor medically equaled the criteria in "Paragraph B" or "Paragraph C" of listings 12.04, 12.06 and 12.09.[4] (AR 14). "Paragraph B" requires at least two of: marked restrictions of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, or repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ found mild restrictions in Plaintiff's daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, but no difficulties in performing unskilled tasks and no episodes of decompensation of extended duration. (AR 14).

    The ALJ found that Plaintiff failed to meet the "Paragraph C" requirements of listing 12.04. (AR 14). He found no evidence of repeated episodes of decompensation of extended duration and no evidence of a current history of one or more years' inability to function outside a highly supportive living arrangement. (Id.). He also found no evidence of a residual disease process such that even a minimal increase in mental demands or change in environment would likely cause Plaintiff to decompensate. (Id.). "Paragraph C" in listing 12.06 requires a complete inability to function independently outside of the home. (Id.). The ALJ

---

[4] These cited listings relate to chronic affective disorders (12.04); anxiety disorders (12.06); and substance addiction disorders (12.09). 20 C.F.R. Pt. 404, Subpt. P, App. 1.

found no evidence of such a limitation. (Id.). The ALJ also found that Plaintiff's opiate addiction failed to meet the "Paragraph C" requirements in listing 12.09, as there was no evidence of any behavioral or physical changes associated with the regular use of substances that affect the central nervous system. (Id.).

The ALJ noted that Plaintiff was born on April 22, 1969, was 41 years old at the time of her hearing, and therefore is defined as a younger individual age 18-44 on her alleged disability date. (AR 20). Plaintiff has a high school education and is able to communicate in English. (Id.).

The ALJ found that Plaintiff had the following RFC:

> [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except [Plaintiff] is limited to unskilled work.

(AR 15). In reaching this finding, the ALJ stated that he had considered all of Plaintiff's symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929 and Social Security Rulings ("SSRs") 96-4p and 96-7p. (Id.). The ALJ also considered opinion evidence in accordance with the requirements

1  of 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p

2  and 06-3p.  (<u>Id.</u>).

3

4      The ALJ found Plaintiff's statements concerning the

5  intensity, persistence and limiting effects of her symptoms "not

6  credible" to the extent they were inconsistent with Plaintiff's

7  RFC.  (AR 16).  The ALJ noted that although Plaintiff's daily

8  activities were somewhat limited, she was able to care for her

9  dog, prepare simple meals, drive, cook, clean, use the computer,

10 handle finances, shop for groceries, regularly attend group

11 therapy and interact with her family on Facebook.  (<u>Id.</u>).  The

12 ALJ also noted that Plaintiff enjoyed reading and watching

13 television and had no difficulty following instructions.  (<u>Id.</u>).

14

15     At step four, the ALJ determined that Plaintiff was not

16 capable of performing her past relevant work as a warehouse

17 worker and stocking clerk.  (AR 20).  At step five, however, the

18 ALJ found that Plaintiff was able to perform other jobs existing

19 in significant numbers in the national economy.  20 C.F.R. §§

20 404.1569, 404.1569(a), 416.969 and 416.969(a).  (<u>Id.</u>).  Although

21 the ALJ found that Plaintiff did not have the residual functional

22 capacity to perform the full range of "sedentary" work, her

23 additional limitations had "little to no effect" on the range of

24 sedentary jobs available to her.  (AR 21).  The ALJ found that

25 approximately 200 unskilled sedentary occupations exist, and a

26 significant number of such positions would be available to

27 Plaintiff despite her limitations.  (<u>Id.</u>).  Therefore, the ALJ

28

concluded that Plaintiff was not under a disability as defined by 20 C.F.R. §§ 404.1520(g) and 416.920(g).  (AR 21).

## VI.

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  "The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).  However, the court must "affirm the denial of disability benefits if it is supported by substantial evidence and the Commissioner applied the correct legal standards."  Macri v. Chater, 93 F.3d 540, 543 (9th Cir. 1996).

"Substantial evidence is more than a scintilla, but less than a preponderance."  Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)).  It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion."  Id.  To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'"  Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th

Cir. 1993)).    If  the  evidence  can  reasonably  support  either
affirming  or  reversing  that  conclusion,  the  court  may  not
substitute  its  judgment  for  that  of  the  Commissioner.  Reddick,
157 F.3d at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457
(9th Cir. 1995)).

## VII.

### DISCUSSION

Plaintiff's  single  contention  in  this  action  is  that  the  ALJ
failed  to  properly  evaluate  Plaintiff's  subjective  testimony.
(Memorandum  in  Support  of  Plaintiff's  Complaint  ("MSC")  at  2).
Specifically,  Plaintiff  argues  that  the  ALJ  (1)  improperly
rejected  Plaintiff's  "excess  pain  testimony"  solely  because  the
objective  medical  evidence  offered  no  support  and  (2)  improperly
based  his  decision  on  a  finding  that  Plaintiff's  daily  activities
were  inconsistent  with  her  testimony.    (MSC  at  6-8).    For  the
reasons  discussed  below,  the  ALJ's  decision  must  be  AFFIRMED.

**The  ALJ  Gave  Clear  And  Convincing  Reasons  Beyond  the
Objective  Medical  Evidence  Of  Record  For  Finding  Plaintiff
Not  Credible**

The  ALJ  is  responsible  for  determining  a  claimant's
credibility.   Garrison v. Colvin, 759 F.3d 995, 1010 (9th Cir.
2014).   To determine whether a claimant's testimony regarding her
subjective  pain  or  symptoms  is  credible,  the  ALJ  must  engage  in  a
two-part  analysis.   Id. at 1014.   First,  the  ALJ  must  determine

whether the claimant has presented objective medical evidence of an impairment that could reasonably be expected to produce the pain or symptoms alleged. Id. The claimant does not have to show that her impairment "could reasonably be expected to cause the severity of the symptom[s] she has alleged; she need only show that it could reasonably have caused some degree of the symptom[s]." Id. Therefore, the ALJ cannot reject a claimant's subjective pain testimony "simply because there is no showing that the impairment can reasonably produce the degree of the symptom alleged." Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (quoting Smolen, 80 F.3d at 1282).

Second, if the claimant satisfies the first part of the analysis and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." Garrison, 759 F.3d at 1014-15. The ALJ's findings on credibility must be sufficiently specific to permit the reviewing Court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. See Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008). If the ALJ wants to discredit a claimant's testimony because the complaints are inconsistent with clinical observations, the ALJ can satisfy the clear and convincing evidence threshold by specifying the complaints that are contradicted by specific clinical observations. Regennitter v. Comm'r of Soc. Sec. Admin., 166 F.3d 1294, 1297-99 (9th Cir. 1999); see also Vasquez v. Astrue, 572 F.3d 586, 592 (9th Cir. 2008).

1

2          Moreover, the ALJ must consider the objective medical

3    evidence, together with other evidence, when evaluating a

4    claimant's complaints about her pain and symptoms.  See 20 C.F.R.

5    § 404.1529(c)(2) ("We must always attempt to obtain objective

6    medical evidence and, when it is obtained, we will consider it in

7    reaching a conclusion as to whether you are disabled.  However,

8    we will not reject your statements about the intensity and

9    persistence of your pain or other symptoms or about the effect

10   your symptoms have on your ability to work solely because the

11   available objective medical evidence does not substantiate your

12   statements."). "Instead, the ALJ must discredit the claimant's

13   subjective testimony by finding that she is not credible."

14   Rollins v. Massanari, 261 F.3d 853, 859 (9th Cir. 2001).

15

16        The ALJ may consider several factors when assessing a

17   claimant's credibility, including (1) the claimant's daily

18   activities, (2) inconsistencies either in the claimant's

19   testimony or between her testimony and her conduct and (3) the

20   claimant's inadequately explained failure to follow prescribed

21   treatment.  Chaudhry v. Astrue, 688 F.3d 661, 672 (9th Cir.

22   2012); see also Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th

23   Cir. 2002).  Where "the ALJ improperly rejects the claimant's

24   testimony regarding his limitations, and the claimant would be

25   disabled if his testimony is credited," the testimony is credited

26   as a matter of law.  Lester v. Chater, 81 F.3d 821, 834 (9th Cir.

27   1995).  However, if the ALJ's credibility finding is supported by

28

1  substantial evidence in the record, the court may not engage in
2  second-guessing.  Chaudhry, 688 F.3d at 672.

3

4      Here, the ALJ provided clear and convincing reasons for
5  finding Plaintiff's subjective evidence less than fully credible.
6  Under the first part of the credibility analysis, the ALJ
7  considered Plaintiff's testimony, function reports and the
8  objective medical evidence and properly found that Plaintiff's
9  medically determinable impairments could reasonably cause the
10 alleged symptoms.  (AR 15-16).  The ALJ noted that Plaintiff had
11 "a history of opiate addiction; however, she testified she had
12 been in remission for over one year and was attending group
13 therapy to maintain sober living."  (AR 16).

14

15     Plaintiff had a history of cardiovascular problems beginning
16 with a heart attack that required quadruple bypass surgery in
17 November 2010.  (AR 15, 152, 474).  The ALJ also noted that,
18 weeks later, Plaintiff underwent pectoral muscle flap surgery.
19 (AR 16, 195, 197, 199).  Plaintiff also had a stent placed in her
20 right leg after she reported pain and swelling.  (AR 15, 332-33).
21 Therefore, the ALJ concluded that Plaintiff's medically
22 determinable impairments could reasonably be expected to cause
23 her alleged symptoms and reports of pain.

24

25     However, at the second step, the ALJ found that Plaintiff's
26 subjective statements concerning the intensity, persistence and
27 limiting effects of her symptoms were not credible to the extent
28 they were inconsistent with Plaintiff's RFC.  (AR 16).  In making

1  this determination, the ALJ considered the objective medical
2  evidence along with Plaintiff's testimony and function reports.
3  (AR 16-20).

4

5      Plaintiff alleges that the ALJ failed to provide clear and
6  convincing reasons for discounting her credibility. (MSC at 4).
7  According to Plaintiff, the ALJ improperly relied exclusively on
8  the objective medical evidence in rejecting the severity of
9  Plaintiff's subjective disability complaints. (MSC at 5, 8-9).
10 Plaintiff further contends that the ALJ erroneously concluded
11 that Plaintiff's daily activities directly translated to an
12 ability to work full-time. (MSC at 6-7). She argues that her
13 daily activities are not transferable to a work environment and
14 that she does not need to stop functioning completely to receive
15 disability benefits. (MSC at 7-8).

16

17     Plaintiff's suggestion that the ALJ relied solely on a lack
18 of medical evidence in discounting her testimony (MSC at 5, 8-9)
19 is not supported by the record or the ALJ's decision. The ALJ
20 properly relied on evidence other than Plaintiff's treatment
21 records in finding Plaintiff's subjective testimony less than
22 fully credible. For example, the ALJ cited contradictions
23 between Plaintiff's purported daily activities and her subjective
24 complaints of impairment. (AR 16). An ALJ may use evidence of a
25 claimant's daily activities to discredit her testimony to the
26 extent they contradict claims of debilitating impairment. Molina
27 v. Astrue, 674 F.3d 1104, 1113 (9th Cir. 2012). Moreover,
28 "inconsistencies between a claimant's testimony and the

claimant's reported activities provide a valid reason for an adverse credibility determination." Burrell v. Colvin, 775 F.3d 1133, 1137 (9th Cir. 2014).

Here, the ALJ noted a variety of Plaintiff's daily activities that contradicted her claims of debilitating impairments. (AR 16). For example, Plaintiff testified at the ALJ Hearing that she could not stand or walk for more than two hours a day, that her pain interfered with her ability to do housework and other physical activities and that she could barely lift a gallon of milk. (AR 15, 476-77, 482). Plaintiff also claimed that she bathed and changed her clothes only intermittently, and that she needed help with both tasks. (AR 16, 116, 133). However, Plaintiff also reported that she drove, cooked, cleaned, cared for her dog, prepared simple meals, did laundry and shopped for groceries. (AR 15-16, 20, 116, 134-35, 290, 371). As noted in the ALJ's decision, at an April 2012 medication check with John S. Wells, M.D., Plaintiff told her doctor that although she had some pain in her calves, she "[worked] hard on the treadmill" that morning and that she felt "pretty good about it." (AR 17, 470).

The ALJ cited further inconsistencies in Plaintiff's function reports and testimony. (AR 16). In Plaintiff's second function report, she reported using a cane but she did not do so in her first function report, which was filed only six months earlier. (AR 16, 121, 138). The record does not otherwise indicate that Plaintiff used a cane. Furthermore, when asked

1   which aid was prescribed by a doctor, her only answer was

2   "glasses" suggesting that no doctor prescribed a cane for her.

3   (AR 138).

4

5       Plaintiff claimed that she had difficulty with focus and

6   concentration, but also claimed that she had no difficulty

7   following instructions. (AR 15-16, 137). Plaintiff claimed that

8   she felt isolated and experienced social withdrawal, but also

9   reported that she regularly attended group therapy and interacted

10  with family on Facebook.[5] (AR 16, 288, 478, 482).

11  ────────────────────

    [5] The Court notes further inconsistencies between Plaintiff's
12  testimony and evidence in the record but not specifically
    identified in the ALJ's decision. For example, Plaintiff wrote in
13  her first function report that she was unable to drive and
    testified that her roommates picked up her groceries. (AR 118,
14  477-78). Yet in May 2011, Plaintiff reported that she drove
    regularly and, in October 2011, reported that she had driven her
15  mother to a birthday party several weeks prior. (AR 290, 371).
    Plaintiff also reported in her first function report that she did
16  not shop because she was "afraid of germs" but noted in her
    second report that she went grocery shopping twice per month.
17  (AR 135).

18
    Plaintiff wrote in her second function report that she did
19  laundry once per week but told the ALJ that she did not do
    laundry. (AR 134, 478). Plaintiff reported in May 2011 that she
20  cooked elaborate meals but wrote in her July 2011 function report
    that she could not cook and could only prepare sandwiches and use
21  the microwave. (AR 134, 289). Plaintiff testified that after
    her bypass surgery, she was able to return to work for only six
22  workdays before her limitations forced her to resign. (AR 476).
    However, Plaintiff indicated to several doctors in April, May,
23  June and July 2011 that she was employed at Wal-Mart during those
    periods. (AR 132, 278, 330, 350, 355, 476). Plaintiff wrote in
24  her July function report that on "good days," she got out of bed
    and sat on the couch. (AR 139). She testified that she could
25  not get out of bed approximately twenty days per month. (AR 488-
    89). Yet Plaintiff also reported to Dr. Axtell that she had
26  approximately three good days per week during which she got up
    early, cleaned her house and went shopping. (AR 288). She also
27  told Dr. Axtell that she had no difficulties using the oven and

28

The ALJ also found Plaintiff not credible in part because she failed to follow her prescribed course of treatment. (AR 16-17). An ALJ may find that a claimant's refusal to follow a recommended course of treatment supports a finding that the claimant is not fully credible. See 20 C.F.R. §§ 404.1530(a) and 416.930(a) ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work."); 20 C.F.R. §§ 404.1530(b) and 416.930(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled."); see also Molina, 674 F.3d at 1113 (a claimant's statements may be less than credible if the medical records "show that the [claimant] is not following the treatment as prescribed and there are no good reasons for this failure.") (quoting SSR 96-7p).

Plaintiff was repeatedly advised by her doctors to maintain a heart-healthy diet and testified that she was compliant. (AR 257, 281, 480). However, the ALJ noted that on October 25, 2012, Dr. Nagib indicated that Plaintiff was non-compliant with her diet. (AR 17, 446). Moreover, approximately two months after Plaintiff's heart surgery, she weighed 179 pounds, but her weight had increased to nearly 200 pounds by the time of the ALJ Hearing. (AR 360, 479). The ALJ noted that while doctors advised Plaintiff to stop smoking after her heart surgery, she continued to smoke throughout her recovery period. (AR 16).

---

stove and could prepare meals. (AR 289-90).

In addition, the ALJ properly cited contradictions between Plaintiff's subjective statements and the objective medical evidence of record. For example, the ALJ noted Plaintiff's allegations of severe depression, but also that she was receiving a conservative course of psychotropic medications for "moderate symptomology." (AR 15, 18). Plaintiff testified that she had "never really been to a psychiatrist until this year," i.e.,the year of the hearing. (AR 370, 487-88). "[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007). The ALJ also found that although Plaintiff continued to receive refills of her psychotropic medications, the record showed no evidence of acute mental distress, cognitive dysfunction, psychiatric decompensation or inpatient hospitalizations. (AR 18).

The ALJ similarly acknowledged Plaintiff's complaints of chest pain that allegedly prevented her from lifting more than a gallon of milk, but also referenced a "Work Release" form from Dr. Michelson stating that Plaintiff could lift up to twenty pounds. (AR 15, 17, 350). The ALJ noted that in January 2012, Plaintiff went to a hospital emergency room for chest pains. (AR 17, 419). However, Plaintiff's doctor opined that her symptoms were gastrointestinal and not related to any heart attack. (AR 421). Tests revealed that Plaintiff had a normal sinus rhythm and was negative for abnormal creatine phosphokinase and troponin levels. (AR 17, 420). She was discharged the following day and told to continue her normal medications. (AR 17, 418, 421). The

ALJ also cited Plaintiff's May 2011 examination with Dr. Axtell. (AR 19, 287).   Although Plaintiff complained of depression, irritability, anxiety and fleeting suicidal ideations, Dr. Axtell noted that Plaintiff displayed a "euthymic" mood and opined that her limitations ranged from mild to none.   (AR 19, 289, 291-92).

The ALJ reasonably concluded that Plaintiff's allegations of disabling symptoms were less than credible.   Moreover, the ALJ relied upon both objective medical evidence and additional evidence in the record in reaching his credibility finding. Because the ALJ properly assessed Plaintiff's credibility and provided "clear and convincing reasons" for rejecting her testimony, the Court must defer to the ALJ's conclusion that Plaintiff's subjective testimony was not credible.   <u>Molina</u>, 674 F.3d at 1112.   Accordingly, the ALJ's decision must be affirmed.

## VIII.

### CONCLUSION

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner. The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.

DATED:   July 27, 2015          _____   /S/   _____

                              SUZANNE H. SEGAL
                              UNITED STATES MAGISTRATE JUDGE

THIS MEMORANDUM DECISION IS NOT INTENDED FOR PUBLICATION IN LEXIS, WESTLAW OR ANY OTHER LEGAL DATABASE.